Anthony RISH; Larry Dolph; David H. Roberts, Plaintiffs–Appellees,

and

George H. Van Wagner, III; John McMahon, Plaintiffs,

v.

Sally JOHNSON, Doctor, in her official capacity as Associate Warden of Mental Health Services and Head of United States Public Health Services at Butner Federal Correctional Institute and individually; Cathy Hicks, in her official capacity as Unit Manager, Federal Correctional Institute Butner and individually; Wilber Lemay, Counselor, in his official capacity at Federal Correctional Institute Butner and individually, Defendants–Appellants,

and

Jim King, Case Manager, in his official capacity at Federal Correctional Institute Butner and individually; Michael J. Quinlan, as Director of Bureau of Prisons in his official capacity and individually; U.S. Government, Defendants.

No. 96–7889.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 2, 1997.

Decided Dec. 18, 1997.

**ARGUED:** Barbara Dickerson Kocher, Assistant United States Attorney, Raleigh, North Carolina, for Appellants. Jason

James Kaus, Parker, Poe, Adams & Bernstein, L.L.P., Raleigh, North Carolina, for Appellees. **ON BRIEF**: Janice McKenzie Cole, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellants. Robert H. Tiller, Parker, Poe, Adams & Bernstein, L.L.P., Raleigh, North Carolina, for Appellees.

Before MURNAGHAN and WILKINS, Circuit Judges, and HERLONG, United States District Judge for the District of South Carolina, sitting by designation.

Reversed by published opinion. Judge WILKINS wrote the majority opinion, in which Judge HERLONG joined. Judge MURNAGHAN wrote a dissenting opinion.

## OPINION

WILKINS, Circuit Judge:

Anthony Rish, Larry Dolph, and David Roberts (collectively, "the inmates") are incarcerated at the Federal Correctional Institution at Butner, North Carolina (F.C.I.Butner). They brought this action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging *inter alia* that prison officials [1]violated their constitutional rights under the Eighth Amendment by failing to provide appropriate protective equipment and clothing to safeguard them from the risk of contracting infectious diseases during the performance of their duties as orderlies responsible for cleaning blood and other body fluids from environmental surfaces. The prison officials appeal the denial by the district court of

their motion for summary judgment on the basis of qualified immunity. Because we conclude that the district court erred in refusing to enter judgment in favor of the prison officials, we reverse.

I.

The inmates were incarcerated at F.C.I. Butner during the period of 1988 to 1993.[2] During this period, the inmates volunteered to work as orderlies.[3] As orderlies, the inmates were required to clean the housing, medical, mental seclusion, and hospital areas of the prison. These assignments compelled them to clean, among other areas, medical treatment rooms, lab rooms, triage rooms, and bath and shower areas, as well as the cells of mentally disturbed inmates in the mental seclusion unit. Although the inmates were not involved in patient care, their duties resulted in their exposure to other prisoners' body fluids on environmental surfaces. For example, some of the patients in the mental seclusion unit were so ill that they were unable to control their bodily functions. And, some of the patients threw feces or urine at the walls or smeared it around their cells. Additionally, from time to time, the suicidal tendencies of some of the patients caused them to inflict self-mutilating injuries; as a consequence, the inmates sometimes were required to clean blood from the cells.

The thrust of the inmates' complaint in this litigation is that they were not provided with adequate protective gear to shield them from the risk of contracting infectious diseases while they performed their responsibilities as orderlies. Some of the other prisoners were infected with the human immunodeficiency

---

1. The inmates named as defendants in this litigation a number of prison officials employed at F.C.I. Butner in their individual capacities. Dr. Sally Johnson, Associate Warden of Mental Health Services; Cathy Hicks, Unit Manager for the mental health units; and Wilber Lemay, Counselor, appeal the decision of the district court denying them summary judgment on the basis of qualified immunity. For ease of reference, we refer to these three officials collectively as "the prison officials." The district court granted summary judgment in favor of the remaining prison officials named in the complaint, and they are not parties to this appeal.

2. Rish and Roberts were incarcerated at F.C.I. Butner from 1991 to 1992. Dolph was incarcerated there from 1988 to 1993.

3. Although the inmates initially volunteered for the duty soon after their respective arrivals at F.C.I. Butner, they lacked a full understanding of exactly what the position entailed, and having once committed themselves to the task, they could not refuse to perform the requisite duties without suffering punishment. Accordingly, the inmates' duties as orderlies were not "voluntary" in the sense that they could avoid the risks of which they now complain if they chose to do so.

virus (HIV), which causes acquired immune deficiency syndrome (AIDS), and the hepatitis B virus (HBV), both of which may prove fatal. The inmates assert that universal precautions—protective measures designed to prevent the spread of communicable diseases—are necessary to prevent the spread of infectious diseases during work involving the cleaning of surfaces contaminated with blood or other body fluids. They contend that it is well established that all health-care workers routinely should use barrier precautions, like gloves, to prevent skin exposure when contact with the blood or other body fluids of any patient is anticipated and protective goggles and clothing when exposure to the mucous membranes (*e.g.,* eyes) is possible. The prison officials, the inmates contend, failed to provide them with the equipment necessary to permit them to comply with universal precautions.

The district court determined that, viewed in the light most favorable to the inmates, the evidence presented by the inmates was adequate to raise a genuine issue of material fact concerning whether the prison officials had provided appropriate equipment to allow the inmates to follow universal precautions in performing their duties as orderlies. The district court concluded that although the inmates were provided gloves, they would become torn through use and replacements typically were not made available until at least the following month. No protective eyewear or other garb was made available at any time although the prisoners were furnished regularly with brooms, mops, scrub brushes, and disinfectant. Furthermore, the district court ruled that the evidence was sufficient to support a conclu sion that the prison officials were aware that the inmates did not always have gloves because they saw the inmates performing their duties without them and because the inmates complained to the prison officials about the lack of protection. Nevertheless, the officials did not remedy the situation and ordered the inmates to continue their duties despite the lack of gloves or other gear.[4]

The district court denied the prison officials' motion for summary judgment, which was based in part on their claim that they were entitled to qualified immunity. The court concluded that the evidence presented by the inmates was sufficient to raise a genuine issue of material fact concerning whether the prison officials had knowingly exposed the inmates to a substantial risk of serious harm in violation of the Eighth Amendment. The court further determined "that a reasonable person, especially a federal officer trained in the prevention of infection or charged with ensuring that inmates take the required precautions, would know that they were violating [the] inmates' constitutional rights if they refused to provide the required equipment or training." J.A. 48. The prison officials now appeal the decision that they are not entitled to qualified immunity.

## II.

### A.

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In analyzing an appeal from the rejection of a qualified immunity defense, our first task is to identify the specific right that the plaintiffs assert was infringed by the challenged conduct, recognizing that the right must be defined at the appropriate level of particularity. *See, e.g., Winfield v. Bass,* 106 F.3d 525, 530 (4th Cir.1997) (en banc); *Taylor v. Waters,* 81 F.3d 429, 433 (4th Cir.1996). We then consider whether, at the time of the claimed violation, this right was clearly established and "'whether a reasonable person in the official's position would have known that his conduct would violate that right.'" *Taylor,* 81 F.3d at 433 (quoting *Gordon v. Kidd,* 971 F.2d 1087, 1093 (4th Cir.1992)).

In determining whether the legal right is clearly established, it is critically important to avoid defining the applicable right at too

4. Not surprisingly, the prison officials sharply    dispute the inmates' allegations.

abstract a level. *See Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). The Supreme Court has cautioned against defining the right at too generalized a level, explaining that

> the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039 (citation omitted); *see Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (noting that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). Thus, we must inquire whether the established contours of the Eighth Amendment were sufficiently clear at the time the events underlying this lawsuit occurred to make it plain to reasonable officials that their actions under these particular circumstances violated the inmates' rights.

### B.

▪ The Eighth Amendment prohibits the infliction of cruel and unusual punishment on one convicted of a crime. *See* U.S. Const. amend. VIII. Scrutiny under the Eighth Amendment is not limited only to those punishments meted out by statute or imposed by a sentencing judge. *See Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). The Amendment also provides protection with respect to "the treatment a prisoner receives in prison and the conditions under which he is confined." *Helling v. McKinney*, 509 U.S. 25, 31, 113 S.Ct. 2475, 2479, 125 L.Ed.2d 22 (1993). The showing necessary to demonstrate that the deprivation of which a prison-

er complains is serious enough to constitute cruel and unusual punishment "varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5, 112 S.Ct. 995, 997, 117 L.Ed.2d 156 (1992). In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that "the deprivation of [a] basic human need was *objectively* 'sufficiently serious,'" and that "*subjectively* 'the officials act[ed] with a sufficiently culpable state of mind.'" *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir.1993) (alteration in original) (quoting *Wilson*, 501 U.S. at 298, 111 S.Ct. at 2323).

▪ Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement. *See Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000. In order to demonstrate such an extreme deprivation, a prisoner "must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions," *Strickler*, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions, *see Helling*, 509 U.S. at 33–35, 113 S.Ct. at 2480–81.

▪ The subjective component of an Eighth Amendment claim challenging the conditions of confinement is satisfied by a showing of deliberate indifference by prison officials. *See Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). "[D]eliberate indifference entails something more than mere negligence, ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835, 114 S.Ct. at 1977. It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. *See id.* at 837, 114 S.Ct. at 1978; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir.1995).

At the time these events occurred in 1992,[5] it was clear that as a component of their duty

---

**5.** The events underlying the inmates' claim occurred over the period of 1988 to 1992. During this period, Eighth Amendment jurisprudence was evolving. However, for ease of discussion, we consider the state of law at the end of the period at issue, reasoning that if the law was not

to provide inmates with humane conditions of confinement, prison officials were required to " 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984)); *see also Helling,* 509 U.S. at 33, 113 S.Ct. at 2480 (explaining that "[i]n *Hutto v. Finney,* 437 U.S. 678, 682, 98 S.Ct. 2565, 2568, 57 L.Ed.2d 522 (1978), [the Supreme Court] noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease[ and that t]his was one of the prison conditions for which the Eighth Amendment required a remedy"). The question remains, however, whether the law was so well established that reasonable prison officials should have recognized the unconstitutionality of denying prisoners protective equipment necessary to allow them to follow universal precautions to avoid the risk of infection present in cleaning blood and other body fluids from environmental surfaces during their duties as orderlies.

### C.

### 1.

Certainly, no body of case law existed in 1992 addressing the necessity of prison officials supplying protective gear necessary to ensure that prisoner orderlies may employ universal precautions. The inmates are unable to point to any decision establishing that a prison official exhibits deliberate indifference to a prisoner's reasonable need for safety, or acts unreasonably, by failing to provide orderlies with the protective gear the inmates contend was required. *Cf. Anderson v. Romero,* 72 F.3d 518, 524 (7th Cir.1995) (observing that "even if the adoption of universal precautions were the best approach for a prison to take, it would not follow that the Constitution required it, let alone that such a requirement was clearly established in 1992").

The only decision of which we are aware discussing a similar issue is *Fruit v. Norris,*

905 F.2d 1147, 1150–51 (8th Cir.1990), in which the court held that the Eighth Amendment prohibited prison officials from "forcing inmates to work in a shower of human excrement without protective clothing and equipment," reasoning that " 'common sense' suggests that [the prison officials] should have had knowledge that unprotected contact with human waste could cause disease." The facts underlying that decision are very different from those at issue here, however. Prisoners there were required to clean a well by descending into a narrow and deep hole into which all of the raw sewage from the prison was dumped. During the time that the prisoners were in the hole, raw sewage poured onto them from above their heads. *See id.* at 1149. Obviously, reasonable prison officials could conclude that the *Fruit* decision did not dictate a conclusion that in all circumstances the provision of equipment to follow universal precautions was constitutionally required. Consequently, there was not a single legal decision establishing that the conduct in which appellants purportedly engaged was unconstitutional. *See Good v. Olk–Long,* 71 F.3d 314, 316 (8th Cir.1995) (holding that *Fruit* did not preclude summary judgment on the basis of qualified immunity for prison officials who provided inmates with some—although allegedly inadequate—protection while the inmates worked with human waste).

### 2.

■ Nevertheless, despite the lack of decisional law addressing this issue, the inmates rely on the ruling of the district court in denying summary judgment on the merits of the inmates' claim that there was adequate evidence to raise a genuine issue of material fact on both elements of the Eighth Amendment claim—*i.e.,* that the inmates faced a substantial risk of serious harm from performing their duties as orderlies without the protective gear necessary to comply with universal precautions and that the prison officials actually knew of the risk and responded unreasonably. The inmates contend that

so clearly established in 1992 that the prison officials were not entitled to qualified immunity,

it could not have been so earlier.

reasonable prison officials with actual knowledge that orderlies were exposed to a risk of contracting infectious diseases while performing their duties without following universal precautions could not reasonably have believed that it was constitutionally permissible to require the inmates to perform those duties without protective gear.[6] The question arises, then, whether the district court properly concluded that the evidence was sufficient to raise a genuine issue of material fact as to whether the prison officials possessed actual knowledge of a substantial risk of harm to the inmates.

■■■■■■ In ruling on the prison officials' motion for summary judgment, the district court explained its conclusion that the evidence presented was sufficient to raise a genuine issue of material fact as to whether the prison officials were deliberately indifferent by stating only:

> The court finds that a reasonable person, especially a federal officer trained in the prevention of infection or charged with ensuring that inmates take the required precautions, would know that they were violating inmates' constitutional rights if they refused to provide the required equipment or training.

6. Several courts of appeals have acknowledged a special problem inherent in applying an objective qualified immunity standard in the context of an Eighth Amendment claim that is satisfied only by a showing of deliberate indifference. These courts have held that when forecasted evidence is adequate to raise a genuine issue of fact concerning a prison official's unreasonable response to actual knowledge of a substantial risk of harm, the qualified immunity inquiry drops from the case. *See Delgado–Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir.1996) (explaining that in such circumstances the qualified immunity inquiry and the determination of whether the evidence is sufficient to raise a genuine issue of material fact collapse); *id.* (reasoning that in 1989 it was clearly established that actual knowledge of a substantial threat to inmate safety that was met with unreasonable action by prison officials was violative of the Eighth Amendment; and "[i]f there were genuine issues of fact concerning those three elements, then [the prison official] could not have avoided trial on qualified immunity grounds, because no one in 1989 could reasonably have believed that he could have deliberately ignored a known threat or danger"); *Albers v. Whitley*, 743 F.2d 1372, 1376 (9th Cir.1984) (holding that a finding of deliberate indifference precludes a finding of qualified immunity), *re-*

J.A. 48. The district court rejected the prison officials' argument that there was insufficient evidence that they possessed actual knowledge of a substantial risk of harm, explaining merely that "there is a genuine issue of material fact as to whether there was a substantial risk of serious harm to [the inmates]." J.A. 341. Plainly, this ruling falls short of providing an adequate factual basis for us to conduct a review of the prison officials' entitlement to qualified immunity because we are unable to conclude that the district court found the evidence sufficient to support a finding that the prison officials actually knew that the inmates faced a substantial risk of contracting an infectious disease from their exposure to blood and other body fluids while performing the duties of an orderly. Thus, we must review the record presented to the district court to determine what the evidence, viewed in the light most favorable to the inmates, discloses with respect to the prison officials' actual knowledge of a substantial risk of harm. *See White ex rel. White v. Chambliss*, 112 F.3d 731, 735 n. 1 (4th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 296, 139 L.Ed.2d 228 (1997).[7]

*versed on other grounds*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Miller v. Solem*, 728 F.2d 1020, 1024–25 (8th Cir.1984); *see generally Birrell v. Brown*, 867 F.2d 956, 958 (6th Cir.1989) (collecting cases).

7. In reviewing an interlocutory appeal by a governmental official whose claim of entitlement to summary judgment on the basis of qualified immunity has been rejected, a court of appeals possesses jurisdiction only to the extent that the official maintains his conduct did not violate clearly established law. *See Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995); *Winfield v. Bass*, 106 F.3d 525, 528–30 (4th Cir.1997) (en banc). Thus, we do not possess jurisdiction under 28 U.S.C.A. § 1291 (West 1993) to the extent that the appealing official seeks to assert the insufficiency of the evidence to raise a genuine issue of material fact, and we may not undertake that review absent some independent jurisdictional basis. *See Johnson*, 515 U.S. at 318–20, 115 S.Ct. at 2158–59; *Winfield*, 106 F.3d at 529–30. But, in order to conduct the legal analysis that is properly considered on interlocutory appeal from a denial of summary judgment on the basis of qualified immunity, a reviewing court must know the factual circumstances to which the legal standards are

Our review of the record discloses that the evidence is insufficient to raise a genuine issue of material fact concerning whether the prison officials possessed actual knowledge of a substantial risk of harm.

There was no direct evidence supporting a conclusion that the prison officials actually knew that exposure to the body fluids of other prisoners posed a substantial risk of harm to the inmates. There is no deposition testimony or affidavit indicating that the prison officials actually knew of a risk of harm. In the absence of such evidence, the inmates contend essentially that the risk is so obvious that it may be inferred that the prison officials possessed actual knowledge of the risk. *See Farmer,* 511 U.S. at 842, 114 S.Ct. at 1981 (noting that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious" (citation omitted)). Thus, we must determine, based upon the factual record presented in opposition to summary judgment, whether the risk was so obvious that it can be inferred that the prison officials knew of it.

In support of their position that exposure to blood and other body fluids while performing their duties as orderlies without following universal precautions obviously posed a substantial risk of contracting an infectious disease, the inmates offered an affidavit of Dr. Charles B. Hicks, M.D., Assistant Professor of Medicine in the Department of Medicine, Division of Infectious Diseases, of the Duke University Medical Center. Hicks explained that "[s]ince at least 1987, the [Centers for Disease Control] has recommended that universal precautions—protective measures designed to prevent the spread of infectious and communicable diseases—be observed

and applied in all healthcare settings." J.A. 272. Hicks continued:

[T]he CDC has recommended that all health-care workers should routinely use appropriate barrier precautions to prevent skin and mucous-membrane exposure when contact with blood or other body fluids of any patient is anticipated or possible. In particular, the CDC has recommended that barrier precautions, including gloves, should be used when handling items or surfaces soiled with blood or other body fluids. Universal precautions also requires [sic] more advanced and additional barrier precautions, such as eye protection and additional protective garb, in situations involving potential uncontrolled exposure to blood or other body fluids, including the potential of direct splash or spray exposure or other potential mucous-membrane exposure.

*Id.* Further, Hicks discussed regulations promulgated by OSHA that require "employers of health-care workers [to] ensure that employees who have contact with surfaces and other items, including laundry, contaminated with blood or other body fluids, wear protective gloves and other appropriate personal protective equipment." J.A. 273; *see* 29 C.F.R. § 1910.1030(d)(3) (1996). Hicks also advised that "[i]n 1989, the Federal Bureau of Prisons promulgated Operations Memorandum Number 181–89(6100), which required that disposable gloves be used to prevent the spread of infectious and communicable diseases during work involving the handling of surfaces contaminated with blood or other body fluid products." J.A. 273. Hicks then provided his opinion that "sound medical practice during the time period in question required the staff at F.C.I. Butner to provide ... proper protective equipment to all persons required to perform duties that involved potential contact with items or surfaces contaminated with blood or other body fluids." *Id.*

to be applied. *See Johnson,* 515 U.S. at 319, 115 S.Ct. at 2159; *Winfield,* 106 F.3d at 533. It is often possible for an appellate court to utilize the facts that were assumed by a district court in denying the motion for summary judgment, but when a district court fails fully to set forth the facts supporting its legal conclusion that a gov-

ernment official is not entitled to qualified immunity, the court of appeals must review the materials submitted to the district court to determine what the record, viewed in the light most favorable to the nonmoving party, discloses in order to have a factual basis upon which to base its legal conclusion.

Turning to the risk presented by the handling of items and surfaces contaminated with blood and body fluids, Hicks stated:

> Universal precautions are designed to prevent the spread of infectious and communicable diseases, including HIV. As with other infectious and communicable diseases, HIV can *theoretically*, be spread by direct contact with contaminated substances, items or surfaces. These precautions are necessary to minimize the risk of transmission of infectious and communicable diseases to or from health-care workers.

J.A. 273–74 (emphasis added). Hicks stressed that "[a]ny method by which infected blood or other body fluids are introduced to the bloodstream or mucous membranes may result in transmission of the HIV virus" and that "[c]urrent scientific and medical knowledge about HIV is not sufficient to rule out the possibility of any such avenue of transmission." J.A. 274. Hicks explained that although the principal method of HIV transmission has been unprotected sexual intercourse and sharing contaminated hypodermic needles, health-care workers had contracted HIV through inadvertent needle sticks, or other punc ture wounds, and through "contact with infected blood products by direct splash or spray exposure." *Id.* Hicks opined that "direct contact with potentially infectious blood or other body fluids poses a sufficient risk of potential exposure to and transmission of infectious and communicable disease that it is reasonable and prudent to observe universal precautions." *Id.*

Nothing contained in Hicks' affidavit is adequate to demonstrate that the failure to follow universal precautions created such an obvious and substantial risk that the prison officials must have been aware of it. Indeed, Hicks' affidavit indicates that the risk of the transmission of HIV to health-care workers like the inmates, who are not at risk for puncture wounds or splashing exposure to blood or other body fluids,[8] is at most "theoretical[ ]," *id.* at 273, and cannot be "rule[d] out," *id.* at 274. The CDC guidelines on which Hicks relied support the conclusion that there is no documented risk of transmission of HIV or HBV from cleaning surfaces contaminated with blood or other body fluids or handling items like laundry that are so contaminated. *See* J.A. 333 (explaining that "the only documented occupational risks of HIV and HBV infection are associated with parenteral [*i.e.*, skin-piercing] (including open wound) and mucous membrane exposure to blood and other potentially infectious body fluids"); *id.* at 334 (noting that "[a]lthough soiled linen may be contaminated with pathogenic microorganisms, the risk of actual disease transmission is negligible"). Thus, Hicks' affidavit cannot support a conclusion that the risk of contracting an infectious disease while performing the duties of an orderly without following universal precautions was so obvious that actual knowledge can be inferred from its mere existence. As such, the evidence that the prison officials possessed actual knowledge of a substantial risk of harm to the inmates is inadequate to raise a genuine issue of material fact.[9]

### III.

In sum, the evidence supporting a conclusion that the prison officials possessed actual knowledge of a substantial risk of harm to

---

*Winfield,* 106 F.3d at 533.

**8.** The inmates do not contend, and have offered no evidence to support a conclusion, that they had any patient contact, engaged in any health-care activities, or were in contact with sharps employed in patient care.

**9.** The dissent faults the majority for failing to consider the prison officials' declarations, asserting that they demonstrate an awareness that universal precautions were required to prevent disease. A review of the material to which the dissent points undoubtedly would support a conclusion that the prison officials understood that adherence to universal precautions was prudent as a means to avoid disease. However, that proposition is a far cry from an understanding that the failure to follow universal precautions exposed prisoners to a substantial risk of serious harm. Evidence of the adherence to a practice because it is prudent to avoid a harm simply does not support a finding that the failure to follow that practice necessarily exposed the prisoner to a substantial risk of serious harm. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (holding that evidence is insufficient to raise a genuine issue of material fact to avoid summary judgment "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

the inmates is insufficient to raise a genuine issue of material fact. And, there is no clearly established law dictating that prison officials are deliberately indifferent to a substantial risk of bodily harm if they fail to provide equipment to inmates to ensure that they may follow universal precautions in performing the duties of an orderly. Thus, the district court erred in refusing to grant summary judgment to the prison officials on the basis of qualified immunity.

*REVERSED.*

MURNAGHAN, Circuit Judge, dissenting:

This case illustrates the unwisdom of our decision in *Winfield v. Bass,* 106 F.3d 525 (4th Cir.1997) (*en banc* ), to the extent that it allows a circuit court, reviewing a denial of summary judgment on qualified immunity grounds, to conclude that the evidence was insufficient to present a genuine issue of material fact for trial. A circuit court is qualified to decide pure issues of law, and the majority opinion ably explains the applicable law regarding qualified immunity and the Eighth Amendment in Section II A & B above. A district court, however, is much better suited than a circuit court is in determining whether there are disputed issues of material fact sufficient for trial.

The majority in this case goes astray when it second-guesses that factual judgment. Since I do not agree with its weighing of the evidence, I respectfully dissent.

I.

A circuit court has no jurisdiction to review a district court's denial of summary judgment on the grounds that the evidence was insufficient to support the claim, even in a qualified immunity case. So held the Supreme Court in *Johnson v. Jones,* 515 U.S. 304, 313, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995). When the district court has not set out sufficient facts to explain its denial of summary judgment on qualified immunity grounds, however, we may review the record in order to determine what facts the district court likely assumed as a basis for denying summary judgment. *See id.* at 319, 115 S.Ct. at 2159. After that review we can decide the

purely legal question of whether those facts make out a violation of clearly established law. *See id.*

This Circuit's decision in *Winfield v. Bass,* 106 F.3d 525 (4th Cir.1997) (*en banc* ), almost totally emasculated the Supreme Court's *Johnson* holding. In *Winfield,* we held that "in determining what facts the district court 'likely assumed,' we must determine what the evidence actually shows when viewed in the light most favorable to the nonmoving party." *Id.* at 534. Today's majority uses the *Winfield* holding to return to the precise practice that the Supreme Court overruled in *Johnson*—reversing a denial of summary judgment on the grounds of qualified immunity because the circuit court believes that "the evidence presented was insufficient to create a triable issue of fact." *Id.* at 529 (explaining that we had previously allowed a court of appeals to "review a district court order rejecting a defense of qualified immunity" on the basis of insufficiency of the evidence, but "the *Johnson* Court, however, rejected our prior practice").

And so today the majority can both explain that "we do not possess jurisdiction under 28 U.S.C.A. § 1291 (West 1993) to the extent that the appealing official seeks to assert the insufficiency of the evidence to raise a genuine issue of material fact, and we may not undertake that review absent some independent jurisdictional basis," majority opinion at 1098 n.7, and then a few pages later conclude "[i]n sum, the evidence supporting a conclusion that the prison officials possessed actual knowledge of a substantial risk of harm to the inmates is insufficient to raise a genuine issue of material fact," majority opinion at 1101. The majority's conclusion, albeit appropriate after *Winfield,* is unsustainable here.

II.

The instant case illustrates the unwisdom of the *en banc* majority decision in *Winfield.* An appellate court is not well-suited to poring through a cold record and determining "the existence, or nonexistence, of a triable issue of fact," whereas it "is the kind of issue that trial judges, *not appellate judges,* confront almost daily." *Johnson,* 515 U.S. at

316, 115 S.Ct. at 2157 (emphasis added). Perhaps this disadvantage explains the instant disagreement whether there was sufficient evidence to conclude that the prison officials actually knew of a risk of harm from exposure to the bodily fluids of other prisoners (a finding necessary for the subjective, deliberate indifference prong of the Eighth Amendment cruel and unusual punishment standard).

The majority reverses the denial of summary judgment because it finds insufficient evidence that the defendants actually knew of the risk of harm from cleaning up infectious bodily fluids and feces without gloves or other protective equipment.

> There was no direct evidence supporting a conclusion that the prison officials actually knew that exposure to the bodily fluids of other prisoners posed a substantial risk of harm to the inmates. There is no deposition testimony or affidavit indicating that the prison officials actually knew of a risk of harm.

Majority opinion at 1099.

It is true that no defendant stated in so many words"I actually knew that exposure to inmates' blood and feces without gloves or other protective equipment posed a substantial risk of serious bodily harm." Of course such an explicit admission is not likely to be made; but we can infer such knowledge from circumstantial evidence. *See Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . .").

The majority purports to realize that circumstantial evidence can demonstrate knowledge of risk, in fact citing this very quotation from *Farmer*. *See* majority opinion at 1099. Nevertheless, in evaluating the circumstantial evidence the majority focuses on the affidavit of one expert witness and ignores the affidavits of the defendants themselves. The majority may be correct in asserting that "[n]othing contained in [Doctor] Hicks' affidavit is adequate to demonstrate that the failure to follow universal precautions created such an obvious and substantial risk that

the prison officials must have been aware of it." Majority opinion at 1100. But the evidence from the defendants' own declarations is sufficient to demonstrate their knowledge that universal precautions were required to prevent disease. The practices of the officials at the time belie their current claim that they were unaware of the substantial risk of serious harm. One example comes from Dr. Johnson's own description of the practices at the clinic, and the precautions that she believed were "required":

> I, Sally Johnson, M.D., hereby declare and state as follows:
>
> 1. I am the Associate Warden for Health Services (AWHS) at the Federal Correctional Institution, Butner, North Carolina, a position I have held since August, 1990. I am also a commissioned officer of the Public Health Service having been commissioned on July 1, 1979. I have general supervisory responsibility for the Mental Health Division and the Health Services Division.
>
> .   .   .   .   .
>
> 3. We have several inmates and patients at this facility known to have the HIV virus. Since we do not test all inmates and because the tests available may not detect very recent HIV infection, there may be others unknown to us who are infected as well, even though they may have originally tested negative. *For this reason, sound medical and safety practices require that "Universal Precautions" be taken*—i.e., that a person take certain precautions whenever it is possible that bodily contact with another person's bodily fluids may occur. Although saliva, urine and feces are not known to transmit the virus, the Bureau of Prisons' practice is to utilize Universal Precautions in all situations that involve bodily fluids.
>
> 4. At all times, relevant to this action, the Bureau of Prisons, including FCI–Butner, has trained staff and inmates in the use of Universal Precautions. Those staff and inmates who perform jobs most likely to involve exposure to

another person's blood receive specific training and protective supplies/equipment consistent with the possible exposure level.

In the vast majority of instances, *the only protection needed is the use of gloves to prevent direct contact* and disinfectant such as any common household disinfectant, bleach, or laundry detergent. *These supplies are and have been at all times, relevant to this action readily available to all staff and inmates at FCIButner.*

. . . . .

8. Cleaning tasks in both the clinic and Seclusion Unit are performed in much the same manner by both staff and inmates. Again *Universal Precautions are taken which usually require that the staff member/inmate orderly wear gloves and use a disinfectant when body fluids could be present.* When medical examination gloves are not sufficiently durable, rubber work gloves are available for use. If there is a chance that footwear could be exposed to body fluids, rubber boots are used and if there is a chance that eyes or the mouth could be exposed to splashes, then goggles and a medical face mask are available for use. Jumpsuits are available to protect clothing from exposure as necessary. Because the jumpsuit is made of cloth, disposable coverups were obtained. Accordingly, I directed the purchase of biological-chemical suits which consist of a light helmet with full face shield, a disposable nonabsorbent body suit that also covers the foot area, gloves and a mask.

9. I am frequently in the clinic and in the Seclusion Unit. I have never seen an inmate orderly fail to use appropriate Universal Precautions when such was required. Precautions are often taken in excess of those necessary and this is encouraged. To my knowledge, we have never been out of gloves or disinfectant or other supplies or equipment appropriate to the proper exercise of Universal Precautions.

I have never observed infectious waste improperly handled by staff or inmates, nor have I ever observed infectious waste in regular office trash receptacles. No such violations or conditions have been reported to me by staff or inmates.

. . . . .

12. At one point, inmate Rish did ask to know the HIV status of secluded patients. I advised him that such information was available only if there was a need to know and that the job did not require this information. All workers—staff and inmates—are required to use Universal Precautions and treat all patient areas "as if" they were infectious.

. . . . .

J.A. at 316–19 (declaration of Sally Johnson, M.D.) (emphasis added). The plaintiffs have alleged that Dr. Johnson knew that the inmate orderlies were required to clean up other inmates' blood, without gloves. *See* J.A. 175–76 (deposition of plaintiff Dolph) (affirming that Dr. Johnson saw him at times cleaning up feces or blood without gloves); J.A. 226–29 (deposition of plaintiff Roberts) (affirming that he asked Dr. Johnson for gloves to clean up the blood of an inmate who he later learned was infected with HIV). And Dr. Johnson admitted in her deposition that blood was potentially infectious material warranting the use of universal precautions:

Q. It is correct, is it not, that among other measures universal precautions requires the use of personal protective equipment to avoid coming in contact with potentially infectious material?

A. If that's what the situation warrants, we would do that.

Q. Well, if there is potentially infectious material, let's say blood, the situation would warrant universal precautions?

A. Yes, that's right.

J.A. at 285 (deposition of Dr. Johnson).

The other defendants also indicated their belief in the importance of inmate orderlies' observing universal precautions. Defendant Wilbur Lemay affirmed that an orderly's ob-

serving universal precautions when cleaning up blood was important:

Q. If there were, say, an accident of some sort in which there were *blood*—

A. Uh-huh (Yes).

Q. —And it needed to be cleaned—and—*it would be normal for an orderly to clean that up; is that correct?*

A. *That would be normal, yes.*

Q. Okay. *And it would be important for that orderly to observe universal precautions; correct?*

A. *Yes.*

Q. So, how is it you would make sure that the orderly had the gloves necessary for universal precautions?

A. They're issued them....

J.A. at 313 (deposition of defendant Lemay) (emphasis added). Lemay knew that orderlies should use gloves to protect themselves from disease when cleaning up bodily fluids.

Q. Are you familiar with the term "universal precautions"?

A. Yes.

Q. It's correct, is it not, that those are measures used to prevent infection of HIV and hepatitis B?

A. You're to protect yourself from it.

Q. Okay. Explain to me your understanding of universal precautions.

A. Anytime that you think that your involvement or cleaning up any fluids that could pass on these diseases to you, that you protect yourself from it the best way that you could.

Q. Okay. *And what would be the ways of protecting yourself?*

A. *Using gloves.* The way they would be disposed of after it's cleaned.

*Id.* at 309–310 (emphasis added). It is elementary that the reason Lemay believed that these precautions were important was to prevent the transmission of disease. When he suggested that an orderly use gloves to protect himself, he clearly meant to protect himself from disease.

Defendant Cathy Hicks was more explicit in her explanation that inmate orderlies should use protective devices when they might come in contact with blood, urine, feces, or saliva:

Q. Okay. Moving on to another topic, are you familiar with the term "universal precautions"?

A. Yes.

Q. And what's your understanding of that term?

A. Well, my understanding is that anytime that a person come in contact or exposed or have to handle any type of infectious—the—anything that might be considered as infectious material—which would be like *blood spills or human waste, saliva, whatever—they should use some type of protective coating on their skin to prevent any type of direct contact.*

Q. What kind of substances do you include in the *substances that require universal precautions? You mentioned blood. What other kinds of substances would apply?*

A. Well, for being in—involved in a medical type setting, that could be syringes or alcohol pads that has had direct contact with a, you know, exposed area of blood; *soiled ur—laundry, whether it's urine, feces or whatever. Some of them with bloodstains, you know.*

Q. Okay, so, the bodily substances or the bodily fluids that you would include, *would at least include blood and urine and feces; and I think you may have mentioned saliva as well?*

A. *Right.*

Q. And what kind of safety precautions are called for under universal precautions for handling those bodily fluids?

A. Your surgical gloves, that's what we, you know, use out at the institution, gloves. If there's any kind of way that you think that there is going to be stuff thrown on you or whatever, you know, we have plastic suits or shields or whatever that we use to protect the person.

Q. Are there any other protective devices that you know of that universal precautions can require sometimes?

A. Such as certain bags—of putting items in that have—you know, might have these types of fluids on them.

Q. Do you mean bags to put them in for disposal?

A. Right. Disposal bags.

Q. Do you know of a prison policy requiring universal precautions be followed?

A. Is there a prison policy?

Q. Yes. I'm asking do you know of one?

A. I'm sure that there is, yes.

J.A. at 296–98 (deposition of defendant Hicks) (emphasis added). Ms. Hicks further testified that she had been aware of the prison system's policy that universal precautions be followed throughout her tenure at Butner, from 1988 forward. *See* J.A. at 299–301.

### III.

The foregoing evidence suffices to establish a genuine issue of material fact regarding whether the defendants had actual knowledge of a substantial risk of serious harm when inmate orderlies were exposed to other inmates blood, and perhaps when they were exposed to feces, urine and saliva, without gloves or other protective equipment.* In light of the above illustrated evidence and other similar evidence throughout the record, I cannot concur in the majority's conclusion. I believe that the motion for summary judgment on the basis of qualified immunity was properly denied.

---

* The majority notes that the above-recounted evidence "simply does not support a finding that the failure to follow[universal precautions] necessarily exposed the prisoner to a substantial risk of serious harm." But of course that is not the standard on a summary judgment motion: the evidence need only raise a genuine issue of material fact regarding whether the defendants understood that their failure would produce such a risk, and every reasonable inference is to be drawn in favor of the nonmoving party.